## UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

United States of America,

                Plaintiff,

            v.                              Case No. 07-20051-JWL

John D. Troxel,

                Defendant.

_____

### MEMORANDUM & ORDER

On October 23, 2007 Mr. Troxel was indicted in a Superseding Indictment on three counts of being an unlawful user of a controlled substance who possessed firearms.  (doc. #18) The matter is presently before the Court on Mr. Troxel's Motion to Suppress (doc. #14) and the Government's response thereto (doc. #23).  The Court conducted an evidentiary hearing on the Motion on March 17, 2008.  After thoroughly considering the parties' arguments and the evidence, the Court denies the Motion in part and orders supplemental briefing on the remaining issues, as set forth by the Court in Part IV.

### FINDINGS OF FACT

Sergeant Chambers of the Anderson County Sheriff's Department received a phone call from Ms. Norma Troxel on July 28, 2006, around 8:50pm.   Ms. Troxel said that her husband, the defendant in this case, was tearing up their house, that he had been up four or five days on some kind of drug, that they had a dispute, and that she had taken her dog and left the residence.

1

She said the house was located at 18084 Northwest 2500 Road, Williamsburg, Kansas, about a mile east of Colorado Road.  It is in a rural area.  Sergeant Chambers advised her to stay away from the residence and that the officers would try to locate Mr. Troxel to see what the situation was.  Ms. Troxel responded that if there was a red car in the driveway, Mr. Troxel would be at the residence.

Sergeant Chambers and Trooper Jason Mills of the Kansas Highway Patrol responded to a house on 2500 Road.  Sergeant Chambers saw a white and brown double-wide trailer with a red car in the driveway, but with no identifying address numbers.  The officers knocked on the door, but there was no response.  The officers called Ms. Troxel and met her about a mile away where she was waiting.

When Sergeant Chambers initially arrived, Ms. Troxel told him that she and Mr. Troxel were having problems because Mr. Troxel thought that she was going through his items.  He said that Ms. Troxel implied to him that the argument was about Ms. Troxel going through Mr. Troxel's items in his room, also referred to as the "gun room."[1]

Sergeant Chambers asked Ms. Troxel for consent to go into the residence to look for Mr. Troxel.  She agreed and accompanied the officers to the home at which the officers had previously been.  The red car was still in the driveway.  She unlocked the back door and let the officers in.  Sergeant Chambers had Ms. Troxel accompany them because he thought it was

---

[1] It is not altogether clear from the testimony, when this implication was made, but based on the record before the Court, it appears that it was made in connection with the statement that Mr. Troxel was upset because she was going through his things, a statement which was made when the officers initially arrived.

safer for her to be with them than outside when Mr. Troxel's exact location was unknown. Sergeant Chambers identified himself as he entered but did not hear any noise in response.

Immediately upon entering, the officers observed that cabinets were torn off and drawers were broken in the kitchen. In the living room, there was a broken fan and a potted plant had been thrown against the wall. Sergeant Chambers checked the bathroom, including behind the shower curtain, but did not find Mr. Troxel.

Sergeant Chambers then went into the "gun room," which was a small room that had a big gun vault, a work bench, and no door. Sergeant Chambers testified that there was nothing in the room that was feminine or would have led him to believe that it was Norma's room. Ms. Troxel was waiting in the hallway.    The sergeant entered the room and checked behind boxes by the work bench, which was on the east and north wall. He then walked over to check the gun vault, which was on the opposite wall. As he walked towards the gun vault, he passed a wooden stool that had a plastic, one gallon one quart ice cream bucket sitting on top of it with no lid. As he walked passed it he looked down and saw several syringes inside the bucket. The sergeant also saw a "dug out," a wooden container used to hold marijuana and tube to smoke it, on top of the work bench. When he picked it up, he could smell the marijuana.

Based on his training, Sergeant Chambers believed the syringes were possible drug paraphernalia used to ingest methamphetamine, heroin, or cocaine. He asked Ms. Troxel both if Mr. Troxel was a diabetic who used insulin and also whether the syringes were used for their horses. Ms. Troxel said that he was not a diabetic, and they were not used for the horses. At the time when the officer was asking Ms. Troxel about the syringes, Ms. Troxel told the officer that the room was Mr. Troxel's room and that during the entire time they had lived at the house, she

was not allowed to go into that room.[2]  Sergeant Chambers did not clarify the details of the agreement about the room between Mr. and Ms. Troxel.  Instead, he asked Ms. Troxel for consent to search the whole residence, including that room, for any other drug paraphernalia or drugs.  She gave consent.

Sergeant Chambers then recovered a cooler that was on the floor next to the barstool, and he found a glass pipe with a piece of cotton and some residue on it, a cigar container with two syringes in it, rolling papers, a rolling machine, and a bag of green vegetation.  Based on his experience, the sergeant thought that the residue was methamphetamine, but it was later determined by laboratory tests to be cocaine.  He thought the cotton ball could have been used to strain the narcotics prior to injection.   The sergeant thought this was consistent with methamphetamine use and Ms. Troxel's statement that Mr. Troxel had been up for four or five days on some kind of drug. The officer testified that a complete search for drugs or other drug paraphernalia was conducted that night. The officers searched the rest of the house, but Mr. Troxel was not found.  At some point before the officers left the house, Ms. Troxel had told them that the physical and verbal abuse caused her to call the police and Sergeant Chambers believed a domestic battery had occurred.

The next day, July 29, 2006, another officer told Sergeant Chambers that he received a call from Ms. Troxel around 3:15pm.  Sergeant Chambers went to the Troxel's residence around 4:00pm but there was no answer when he knocked on the door.  The sergeant and the other

---

[2] During direct examination, Sergeant Chambers testified that he did not remember at what point Ms. Troxel told him that she was not supposed to go into the "gun room."  On cross-examination he stated that he was not sure at what point he learned that Mr. Troxel had his own room, but also stated that when he was discussing the syringes with Ms. Troxel, she said that the room was "John's room," and that she was not allowed to enter that room.

officer returned to the sheriff's office.  Ms. Troxel called the office because she wanted the officers to accompany her while she fed her horses.  She indicated she was scared because when she went to the house that morning, Mr. Troxel was again tearing up the house and threw a cup of water at her car and cussed her out before she left.  The officers went back to the house where they met Ms. Troxel, who again gave them consent to enter to find Mr. Troxel.

The officers entered the house and saw that it was "destroyed" and uninhabitable.  They saw broken plumbing, no cabinets left on the wall, smashed television and chairs, and food all over the walls.  All the rooms were similarly destroyed, with the exception of the "gun room." The "gun room" was cluttered and looked different than the day before but was not as trashed as the other rooms.  The officers, led by a search dog, found Mr. Troxel lying on his bed, and he was taken into custody.

Sergeant Chambers again received consent from Ms. Troxel to search the residence.  The sheriff that was with him suggested that Sergeant Chambers should get a search warrant before doing a complete search of the residence.  The sheriff contacted Detective Valentine with the Anderson County Sheriff's Department.  Detective Valentine testified that the information on the warrant and affidavit came from Sergeant Chambers.  This included what items they had recovered during the July 28, 2006, search.  He told the detective that some items were found in plain view and others in a cooler.  He also told the detective the address was 18084 Northwest 2500 Road and described the physical description of the residence.  At some point prior to obtaining the federal search warrant on August 2, 2006, it was determined that 18084 did not exist on that road and that the Troxel's address number was 14084.  Detective Valentine said that he knew the officers had done a complete "walk through" search and that they wanted to do

a complete search of the residence based on the search warrant. He did not include in the application why they thought they would find additional drugs or paraphernalia. He did not call Sergeant Chambers to verify that the information he had written was accurate.  Sergeant Chambers and Trooper Mills waited at the residence while the search warrant was prepared and approved by the magistrate judge.  The detective arrived with the search warrant, and the three officers completed a search of the home.  They recovered a smoking device and a tin can with stems and seeds of marijuana in it on a shelf in the "gun room".

A few days later Ms. Troxel also turned over to the officers a pipe and a syringe that she had found.  Around the same time, Sergeant Chambers ran a criminal background check on Mr. Troxel and found that he possibly had a prior felony conviction.  He called the Bureau of Alchohol, Tobacco, Firearms, and Explosives because he knew about the guns in the house.  On August 2, 2006, Special Agent Christopher Cannon with the ATF, applied for and received a search warrant for 14084  NW 2500 Road.  He based the application in large part on the police report provided by Sergeant Chambers, as well as information from Ms. Troxel and other ATF agents.  He said that but for the Anderson County investigation, he would not have applied for a search warrant for the Troxel's residence.  Also, he included information in the application about the "gun room," such as that the gun vault was located within a room that Mr. Troxel did not allow Ms. Troxel to enter and that Mr. Troxel historically forbade her entry into the room despite there being no door on the hinges.  That same day, he and other agents searched the house and recovered thirty firearms and ammunition from the vault in the "gun room."

**DISCUSSION**

I.      **The officers did not exceed the scope of Ms. Troxel's consent to search for Mr.**

        **Troxel.**

Mr. Troxel first argues that even assuming that Ms. Troxel had the authority to consent to the search of the "gun room" (discussed in Part II), the officers exceeded the scope of the consent to search for Mr. Troxel by entering into that room. He reasons that because there was no response to the officers yelling and moving about the residence, the chance that Mr. Troxel was present was unlikely.  Because of the room's small size, officers had a clear view of the room from the doorway and did not need to enter to complete the search for him in that room. He also alleges that the scope was exceeded when the officer looked into the ice cream bucket in which Mr. Troxel could not fit.

"The scope of a search is generally defined by its expressed object."  *United States v. Kimoana*, 383 F.3d 1215, 1223 (10th Cir. 2004) (quoting *Florida v. Jimeno*, 500 U.S. 248, 251 (1991)).  "Consent to search for specific items includes consent to search those areas or containers that might reasonably contain those items."  *Kimoana*, 383 F.3d at 1223.  "Whether a search remains within the boundaries of the consent is a question of fact to be determined by the totality of the circumstances."  *Id.*  It is also well established that so long as the plain view doctrine elements are satisfied, that "an officer who is legally present and searching for one item need not deliberately disregard other items but rather may lawfully seize such items."  *United States v. Sanchez*, 89 F.3d 715, 719 (10th Cir. 1996).

Sergeant Chambers testified that he went into the "gun room" and searched behind boxes by the tool bench in an area where an individual could hide.  He also saw a gun vault, which was big enough for an individual to fit in and decided to search in it.  He only saw the inside of the

ice cream bucket as he was passing through the middle of the room when moving from one area,

behind the work bench, in which Mr. Troxel may have been hiding to a second area, the vault,

another area where he may have been hiding.  Sergeant Chambers was not required to disregard

what he saw in that open bucket simply because the size was too small to hold Mr. Troxel.  *See*

*Sanchez*, 89 F.3d at 719.  Based on these facts, the Court finds that Sergeant Chambers did not

exceed the scope of the consent to search for Mr. Troxel because he was searching areas within

the room in which an individual could reasonably hide.

II.     **The seizures of the "dug out" and the syringes in the ice cream bucket are lawful**

**pursuant to the plain view doctrine.**

"Although the Fourth Amendment generally requires officers conduct searches and

seizures pursuant to a warrant, officers may seize evidence in 'plain view' without a warrant."

*United States v. Castorena –Jamie*, 285 F.3d 916, 924 (10th Cir. 2002) (citing *Coolidge v. New*

*Hamphire*, 403 U.S. 443, 465 (1971)).  "A plain view seizure of incriminating evidence is

sustainable if (1) the item is indeed in plain view; (2) the police officer is lawfully located in a

place from which the item can plainly be seen; (3) the officer has a lawful right of access to the

item itself; and (4) it is immediately apparent that the seized item is incriminating on its face."

*United States v. Corral*, 970 F.2d 719, 723 (10th Cir. 1992).  Here, the Government alleges that

the syringes and one pipe were properly seized under the plain view doctrine.  Mr. Troxel argues

that the first, second, and fourth requirements of this doctrine are not met.  Each of the four

requirements is discussed in turn.

a.  **Items in plain view**

As previously discussed in Part I, Sergeant Chambers was not required to disregard an item simply because he saw it within a container that was not large enough for an individual to fit into. *See Sanchez*, 89 F.3d at 719; *see also supra*, Part I. There was no lid on the container and the officer simply looked down as he was scanning the room and at that time, he saw the syringes in the bucket. *See, e.g.*, *United States v. Porter*, 127 F.3d 1110 (10th Cir. Oct. 14, 1997) (table opinion) (finding that the where the windows were down on a vehicle, the officer could look into the vehicle because he was lawfully in the place from which the item could be seen); *cf. United States v. Gooden*, 787 F.Supp. 309 (E.D.N.Y. 1991) (finding no plain view where the search was for an individual and the ammunition was tucked away inside a small safe inside a bedroom closet that was incapable of harboring an armed individual). Here, while the syringes were inside a bucket, they were not tucked away out of the view of Sergeant Chambers, who was scanning the room for Mr. Troxel, nor were they inside a closed container. He did not have to move the bucket or open a top to see the syringes. The Court, therefore, finds they were in plain view.

    **b. Officers lawfully located in place from which the items could be plainly viewed**

        **i. Scope of the search**

The Court denies Mr. Troxel's argument that the officers were not lawfully located in a place from which the items could be plainly viewed based on the officers exceeding the scope of the search for the same reasons expressed in Part I.

        **ii. Consent to Enter**

Mr. Troxel challenges whether Ms. Troxel had authority to consent to the search of Mr. Troxel's room in which the syringes and the pipe were found on the work bench. The government has the burden of proving that the consenting party had such authority. Under this theory, if the Government does not meet its burden to show that Ms. Troxel had authority to consent to the search of that room, the officer cannot be said to have been lawfully located in the place where the syringes could be plainly seen based on Ms. Troxel's consent.

### 1.  Actual authority

"Voluntary consent to a police search, given by the individual under investigation or by a third party with authority over the subject property, is a well-established exception to the warrant requirement." *United States v. Andrus*, 483 F.3d 711, 716 (10th Cir. 2007). "A third party has actual authority to consent to a search 'if that third party has either (1) mutual use of the property by virtue of joint access, or (2) control for most purposes.'" *Id.* (quoting *United States v. Rith*, 164 F.3d 1323, 1328 (10th Cir. 1999).

"Mutual use of property by virtue of joint access is a fact-intensive inquiry which requires findings by a court that the third party entered the premises or room at will, without the consent of the subject of the search." *Rith*, 164 F.3d at 1329-30. Ms. Troxel told officers that there was a dispute between her and her husband because she was going through his items. She implied to them that it was regarding items in the "gun room." The Court is aware of only this one time that Ms. Troxel went into the room, and it resulted in a dispute between Mr. and Ms. Troxel that led Ms. Troxel to call the police. It is apparent from this situation that Ms. Troxel was not allowed by Mr. Troxel to enter the room without his consent. Ms. Troxel also told the officers that they had lived in the residence for ten years, and she had never been allowed into

the room.  The Court finds that even though Mr. and Ms. Troxel shared the house and there was no door on the room,[3] Ms. Troxel did not enter the "gun room" at will, without the consent of Mr. Troxel.  She did not, therefore, have the authority to consent based on mutual use of the property.[4]

"Unlike the fact-intensive inquiry of mutual use, control for most purposes of property is a normative inquiry dependent upon whether the relationship between the defendant and the third party is the type which creates a presumption of control for most purposes over the property by the third party."  *Id.* at 1330.  Mr. and Ms. Troxel's husband-wife relationship gives "rise to a presumption of control of property."  *See id.* This is because that type of "relationship raises a presumption about the parties' reasonable expectations of privacy in relation to each other in spaces typically perceived as private in a co-tenant relationship.  *See id.*  "[W]hile husband-wife . . . relationships give rise to a presumption of control for most purposes over the property, that presumption may be rebutted by facts showing an agreement or understanding between the defendant and the third party that the latter must have permission to enter the

---

[3] The Court considered that there was no door blocking entrance to the room, but finds that the other evidence is sufficient to show that Ms. Troxel did not enter the room at will and also that there was an understanding between Mr. and Ms. Troxel that she either was not allowed to or needed permission to enter that room.  *Cf. Rith*, 164 F.3d at 1331 (the court noted that there was "no lock on [the defendant's] bedroom door" to prohibit his parents from entering but there also was no evidence of an understanding or agreement); *Andrus*, 483 F.3d at 718 (discussing expectations of privacy of "personal object[s]", noting that those that indicate an expectation of privacy are usually "physically locked").

[4] The Government argues that Mr. Troxel failed to make note of the assumption of risk analysis set forth in *United States v. Matlock*, 415 U.S. 164 (1974).  This analysis, however, relies on first establishing common authority or mutual use of the property.  Here, the Court finds that there was no mutual use of property because Ms. Troxel did not enter and was not allowed to enter the room at will.

defendant's room."  *See id.* at 1330-31. The facts show that the presumption created by the Troxels' husband-wife relationship was rebutted.  In so deciding, the Court relies on the facts discussed under the "mutual use of property," including, for example, that Mr. Troxel did not allow Ms. Troxel to enter the room for approximately a decade.  The facts show that there was at least an understanding, and likely an agreement, between the parties that Ms. Troxel was not allowed to enter that room.  Ms. Troxel did not have actual authority to consent to the search of the "gun room," otherwise known as "John's room."

## 2.  Apparent Authority

The Government argues that even if Ms. Troxel did not have actual authority to consent to the search of Mr. Troxel's room, she had apparent authority to do so.  "Even when actual authority is lacking, a third party has apparent authority to consent to a search if a police officer reasonably, but erroneously, believes that the third party has actual authority to consent." *United States v. Cos*, 498 F.3d 1115, 1128 (10th Cir. 2007).  "The apparent authority inquiry is an objective one: we must determine whether 'the facts available to the officer at the moment ... warrant a man of reasonable caution [to believe] that the consenting authority had authority over the premises[.]'"  *Id.* (alterations in original) (citing *Illinois v. Rodriguez*, 497 U.S. 177, 186-89 (1990)).  "[A] third party has apparent authority if the officer has a reasonable belief that the third party has '(1) mutual use of the property by virtue of joint access, or (2) control for most purposes over it.'"  *Cos*, 498 F.3d at 1128 (quoting *Rith*, 164 F.3d at 1329).

"Importantly, 'where an officer is presented with ambiguous facts related to authority, he or she has a duty to investigate further before relying on the consent.' . . . [T]he government cannot meet its burden of demonstrating a third party's apparent authority 'if agents, faced with

an ambiguous situation, nevertheless proceed without making further inquiry.'"  *Cos*, 498 F.3d

at 1128 (quoting *United States v. Kimoana*, 383 F.3d 1215, 1222 (10th Cir. 2004)).  The Court

finds that Sergeant Chambers was presented with ambiguous facts as to Ms. Troxel's authority

to consent to the search of the "gun room."  At the time that Sergeant Chambers entered Mr.

Troxel's room he knew at least that there was a dispute about Ms. Troxel going through Mr.

Troxel's items, that the dispute was not minor as it had resulted in destruction to parts of the

home, that Ms. Troxel had implied to him the dispute was about the items in the "gun room,"

that there was nothing in the room that led him to believe that it was Ms. Troxel's room, and that

there were no feminine items visible in the room. The Court finds that based on the ambiguity

created by these facts, Sergeant Chambers had a duty to investigate further about whether Ms.

Troxel had access to or control over that room instead of relying solely on the husband-wife

relationship.  The presumption created by the husband-wife relationship can be rebutted by an

agreement or understanding between the parties.   Taking that into consideration, Sergeant

Chambers should have inquired further as to whether there was such an understanding or

agreement.  Because he did not inquire further about these ambiguous facts, the Government

cannot meet its burden of demonstrating Ms. Troxel's apparent authority.

### iii.  Protective Sweep Doctrine

        While the officers had consent to search the residence, Ms. Troxel did not have authority

to consent to the search of Mr. Troxel's room.  Thus, in order for the Government to rely on the

plain view doctrine, there must be another basis on which the officers were lawfully in that

room.  The government argues that once there was consent to enter the residence, the officers

were lawfully in the room pursuant to a protective sweep of all areas in which Mr. Troxel could

be hiding.  A protective sweep is permissible "if the searching officer possessed a reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warranted the officer in believing that the area swept harbored an individual posing a danger to the officer or others."  *United States v. Carter*, 360 F.3d 1235, 1242 (10th Cir. 2004); *see also Fishbein ex rel. Fishbein v. City of Glenwood Springs, Colorado*, 469 F.3d 957, 963 (10th Cir. 2006) ("Carter requires officers to have some articulable basis for their suspicion of danger - - not certain knowledge.").

Unlike the majority of circuits that have held that a protective sweep can be performed upon any legal entry of a residence, the Tenth Circuit has held that a protective sweep is only permissible when it is performed as a search incident to arrest.  *United States v. Torres-Castro*, 470 F.3d 992, 997 (10th Cir. 2006) ("[W]e must conclude that a protective sweep is only valid when performed incident to an arrest--at least until an en banc panel of this court determines otherwise."); *United States v. Walker*, 474 F.3d 1249, 1254 (10th Cir. 2007) ("This court has stated that a 'protective sweep' of a residence to ensure officer safety may take place only incident to an arrest").  "Mr. [Troxel] had not yet been arrested when the officers conducted the sweep [of his room], and the government has not argued [how the sweep of Mr. Troxel's room] was incident to an arrest.  Therefore, *Buie* cannot support the sweep." *Id.* (referencing *Maryland v. Buie*, 494 U.S. 325, 327 (1990), which explained that "[a] 'protective sweep' is a quick and

limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others"). [5]

This search was not incident to an arrest. "In order to be a legitimate 'search incident to arrest,' the search need not take place after the arrest. A warrantless search preceding an arrest is a legitimate 'search incident to arrest' as long as (1) a legitimate basis for the arrest existed before the search, and (2) the arrest followed shortly after the search." *United States v. Anchondo*, 156 F.3d 1043, 1045 (10th Cir. 1998). "Whether or not the officer intended to actually arrest the defendant at the time of the search is immaterial to this two-part inquiry." *Id.* While the officers likely had sufficient probable cause to arrest Mr. Troxel prior to entering the "gun room" based on Ms. Troxel's statements and evidence of his conduct at the home, the arrest did not follow "shortly after the search" because Mr. Troxel was never found or arrested on July 28, 2006. He was not arrested until the next day. *See Torres-Castro*, 470 F.3d at 998 ("We note that courts have found that a search may incident to arrest in cases where the search and arrest were separated by times ranging from five to sixty minutes."). Therefore, the officers were not lawfully present in the room pursuant to a protective sweep because the sweep was not incident to an arrest.

### iv.  Exigent Circumstances

"[O]nce lawfully present in the [room] due to exigent circumstances, the plain view doctrine applies, and police may seize incriminating evidence found in plain view within the

---

[5] The Government describes the protective sweep and mentions the word "arrest," but failed to argue or demonstrate how this search is incident to an arrest. The Court addresses the argument, however, and concludes that the search was not incident to an arrest.

officer's lawful right of access." *United States v. Thomas*, 372 F.3d 1173, 1178 (10th Cir. 2004). "The government bears the burden of establishing exigency." *United States v. Rhiger*, 315 F.3d 1283, 1288 (10th Cir. 2003). "That burden is especially heavy when the exception must justify the warrantless entry of a home." *United States v. Najar*, 451 F.3d 710, 717 (10th Cir. 2006). If exigent circumstances existed to justify entry into Mr. Troxel's room, the officers were lawfully present in the place in which the evidence could be plainly viewed and were permitted to seize such evidence.[6]

The government did not raise this exact argument but addressed safety concerns through the protective sweep doctrine. The Court, therefore, addresses whether exigent circumstances exist to determine if the Government met its burden based on the evidence presented at the hearing. *See United States v. Roof*, 103 Fed. Appx. 652, 2004 WL 1462645 (10th Cir. 2004) (noting that the government waived the exigent circumstances argument by failing to raise it at the district court level, but analyzing the merits of the argument under the plain error standard before determining that the district court did not err by failing to raise *sua sponte* a meritless exigent circumstances argument); *Lopkoff v. Slater*, 898 F.Supp. 767 (D. Colo. 1995) (in civil rights action against police officers, the court addressed the exigent circumstances argument, noting that while the officers did not expressly raise an exigent circumstances argument, their "argument that a warrant is not required in suspected child abuse cases implies that sufficient exigency exists").

---

[6] Officers were permitted to seize such evidence only if it had an incriminating nature. That element is subsequently discussed in Part II.d.

The test to determine whether the doctrine applies is "whether (1) the officers have an objectively reasonable basis to believe there is an immediate need to protect the lives or safety of themselves or others, and (2) the manner and scope of the search is reasonable." *Id.* at 718. The Tenth Circuit has "recognized the exigent circumstances exception to a warrantless entry 'when the circumstances posed a significant risk to the safety of a police officer or a third party.'" *United States v. Layman*, No. 06-7124, 244 Fed. Appx. 206 (10th Cir. Jul. 26, 2007) (citing *Najar*, 451 F.3d at 717)); *see also United States v. Layman*, 244 Fed. Appx. 206, 210 (10th Cir. Jul. 26, 2007) ("Under the first prong of the exigent circumstances exception to the warrant requirement, we evaluate whether the officers had reasonable grounds to believe an immediate need to enter existed 'guided by the realities of the situation presented by the record from the viewpoint of prudent, cautious, and trained officers.'") (quoting *United States v. Najar*, 451 F.3d 710, 718-19 (10th Cir. 2006).

Officers were lawfully in the home based on Ms. Troxel's consent. Once inside, exigent circumstances justified the officers' search of Mr. Troxel's room. Ms. Troxel was present inside the home with the officers, so both officer safety and the safety of Ms. Troxel were at issue.[7]

---

[7] The Court finds that it is important in this analysis that Ms. Troxel was in the residence with the officers and her safety was threatened by the possible presence of Mr. Troxel. This is based on the following language in *United States v. Walker*:

> The sweep may nevertheless have been proper under the exigent-circumstances doctrine set out in *Najar*, 451 F.3d at 717. In the context of this case, however, application of the exigent-circumstances doctrine to justify a sweep for the purpose of officer safety would eviscerate our precedent establishing an incident-to-arrest requirement for such a protective sweep. We note that both *Najar* and the Supreme Court opinion on which it relied, *Brigham City*, --- U.S. ---, 126 S.Ct. 1943, 164 L.Ed.2d 650, involved Fourth Amendment intrusions justified by a threat to a civilian's safety. Therefore, absent clarification from an

The officers saw destruction once they entered the residence, which was consistent with Ms. Troxel's statement that Mr. Troxel was tearing up the home.  They knew that Mr. Troxel had been up for four or five days on some sort of drug.  They knew that there had been a dispute between Mr. Troxel and Ms. Troxel.  They did not know Mr. Troxel's location, but they had reason to believe he was in the home because the red car was in the driveway.  All these facts known to the officers created an objectively reasonable basis to believe there was an immediate need to protect the life and safety of Ms. Troxel.

The manner and scope of the search of the "gun room" at the time the syringes and the "dug out" were found were also reasonable.  At the time the evidence was recovered, the manner and scope of the search were limited to looking for Mr. Troxel, who posed the threat to Ms. Troxel's safety.  Sergeant Chambers entered the room and searched behind the work bench where Mr. Troxel could have been hiding.  He then was on his way over to the gun vault, the other place Mr. Troxel could have been hiding, when he saw the syringes and the "dug out." Because the manner and scope of the search were limited to addressing the exigent circumstance of safety, the Court finds that the search was reasonable.  *See United States v. Najar*, 451 F.3d 710, 720 (10th Cir. 2006). Therefore, exigent circumstances justified Sergeant Chambers's entry into and search of the room at the time he found that evidence.

### c.  Lawful right of access to the items

en banc court, we refrain from justifying this sweep by applying the exigent-circumstances exception based on officer safety.

474 F.3d 1249, 1254 (10th Cir. 2007) (remanding to the district court to determine whether the search could be based on the exigent circumstance of victim safety because that argument had not been addressed at the district court level).

"This [lawful right of access] factor is implicated in situations such as when an officer on the street sees an object through the window of a house, or when officers make observations via aerial photography or long-range surveillance." *United States v. Naugle*, 997 F.2d 819, 823 (10th Cir. 1993).  Here, there is no such problem; the syringes and the pipe were found atop the work bench, and Sergeant Chambers "did nothing more than reach out" to pick up the syringes and the pipe.  *See id.*

### d.  Incriminating nature immediately apparent

"An item's incriminating nature is immediately apparent if the officer had probable cause to believe the object was contraband or evidence of a crime.  A seizing officer need not 'know' or have an unduly high degree of certainty' as to the incriminatory character of the evidence under the plain view doctrine.  All that is required is a 'practical, nontechnical probability that incriminating evidence is involved."  *Castorena-Jamie*, 285 F.3d at 924 (citing and quoting *Arizona v. Hicks*, 480 U.S. 321, 326, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987); *Texas v. Brown*, 460 U.S. 730, 742 (1983); *United States v. Sanchez*, 89 F.3d 715, 719 (10th Cir.1996)).  The Court finds that Sergeant Chambers's view of the "dug out" and syringes, particularly in light of Ms. Troxel's initial statement that Mr. Troxel had been up for four or five days on some kind of drug, gave him probable cause to associate them with criminal activity.  *See, e.g., United States v. Donnes*, 752 F.Supp. 411, 420 (D. Wyo. 1990) (finding that while a bulge in a glove may not have given officer probable cause, the syringe inside the glove gave the officer adequate cause to seize, agreeing with the officer that the syringe indicated that it was probably drug paraphernalia).  The fact the officer also confirmed with Ms. Troxel that the syringes were not

used for insulin or the horses does not take away from the "practical probability" that the syringes were evidence of a crime.

### e.  Conclusion

The Court DENIES the Motion in part as to the bucket with syringes and the "dug out," admitted as Exhibits # 6 and 7 at the hearing.

### III.   The officers illegally seized the rest of the items found on July 28, 2006, in a cooler in the "gun room," introduced as Exhibits #8-13 at the hearing.

The basis for the officers to lawfully be in the "gun room" and seize the evidence in plain view was exigent circumstances, or in other words, the safety of Ms. Troxel.  The scope and manner was limited to searching for the individual, and was therefore, reasonable in light of the safety concerns.  The same cannot be said for the items that were not in plain view that the officers recovered after receiving Ms. Troxel's alleged consent to search for drugs and drug paraphernalia.

First, as previously discussed, Ms. Troxel did not have authority to consent to the search for drugs and drug paraphernalia within the "gun room."[8]  Second, the seizure of the items found while searching areas in which Mr. Troxel could be hiding, including those found in the cooler, cannot be justified on an exigent circumstances basis.   There is a contrast between the officers looking into areas in which Mr. Troxel could be hiding versus the officers opening and looking

---

[8] Ms. Troxel's lack of authority to consent should have been even clearer at this point. During the conversation with Ms. Troxel after the syringes were found but before the search of the cooler, Ms. Troxel told Sergeant Chambers that it was her husband's room and that she had never been allowed in there.

into a cooler in which he could not possibly fit.  Doing so exceeded the scope and manner that was reasonable to address the safety concerns that constituted the exigent circumstances. *Cf. United States v. Najar*, 451 F.3d 710, 720 (10th Cir. 2006) (concluding that the scope and manner of the search pursuant to exigent circumstances was reasonable where "[t]he officers confined the search to only those places inside the home where an emergency would reasonably be associated"). Thus, the Government did not prove the second prong of the exigent circumstances test because the safety emergency could not reasonably be associated with the contents of the cooler.  Consequently, there was no lawful basis on which the officers seized the items in the cooler, so the seizure was illegal.  Whether these items ultimately will be suppressed depends on the inevitable discovery analysis, on which the Court orders supplemental briefing in Part IV.a.

## IV. Issues to be addressed in supplemental briefs by the Government and Mr. Troxel

### a. Inevitable discovery - Factors

The Government argues in the alternative that the Motion to Suppress should be denied because the drugs and drug paraphernalia in the cooler would have been inevitably discovered based on the information known to the officers at the time they seized that evidence.  The Government states that Sergeant Chambers had developed sufficient evidence, including statements by Ms. Troxel, to procure a search warrant at the time the illegal seizure of the items occurred.  The Government, therefore, relies on the notion that a warrant could have been and was later obtained.  Neither party, however, addressed the implications of *United States v. Cunningham*, 413 F.3d 1199, 1203 (10th Cir. 2005), *United States v. Souza*, 223 F.3d 1197,

1206 (10th Cir. 2000), or *United States v. Moore*, 37 Fed. Appx. 963, 968 (10th Cir. 2002).  *See also generally United States v. Brown*, 64 F.3d 1083, 1085 (7th Cir. 1995) ("[W]hat makes a discovery 'inevitable' is not probable cause alone . . . but probable cause plus a chain of events that would have led to a warrant independent of the search.").  The parties shall analyze the potential applications of the factors set forth in *Souza.*

> 1) the extent to which the warrant process has been completed at the time those seeking the warrant learn of the search; 2) the strength of the showing of probable cause at the time the search occurred; 3) whether a warrant ultimately was obtained, albeit after the illegal entry; and 4) evidence that law enforcement agents "jumped the gun" because they lacked confidence in their showing of probable cause and wanted to force the issue by creating a fait accompli.

*Cunningham*, 413 F.3d at 1203-04 (quoting *United States v. Souza*, 223 F.3d 1197, 1204-05 (10th Cir. 2000)).   In addressing these factors, the parties should address how the determination of the validity/invalidity of the search warrant affects the third factor, taking into consideration the issues that the Court orders to be briefed in Part IV.b.  The parties should also discuss, within this same factor, the potential application of the principle that a search warrant cannot be based on unconstitutionally seized evidence. *See United States v. Scales*, 903 F.2d 765 (10th Cir. 1990); *United States v. Gray*, 302 F.Supp.2d 646 (S.D.W.Va. 2004).

### b.  Validity of the Search Warrant

The parties should submit supplemental briefing, analyzing Mr. Troxel's challenges to the truth and validity of the statements included in the affidavit, including those regarding the walk through versus complete search and those referring to the methamphetamine and marijuana found in "plain view," under *Franks v. Delaware*, 438 U.S. 154 (1978).  The parties should consider the actions of both Sergeant Chambers and Detective Valentine, in light of *United*

*States v. Kennedy*, 131 F.3d 1371, 1376 (10th Cir. 1997), which states, "We agree with the decision of the district court to hold the government accountable for statements made not only by the affiant but also for statements made by other government employees which were deliberately or recklessly false or misleading insofar as such statements were relied upon by the affiant in making the affidavit."  In discussing whether Franks applies, the parties may want to look at cases, such as *United States v. Garcia-Zambrano*, 2007 WL 1521577, *4 (D. Colo. May 23, 2007).

The parties should also discuss the impact of the illegal search of the items in the cooler on the validity of the warrant, applying for example, *United States v. Macias*, 202 F.3d 283 (10th Cir. 1999).

Last, the parties should discuss the impact of a finding that statements in the affidavit are found to meet the standard of *Franks* and/or *Macias*.  *See United States v. Karo*, 468 U.S. 705, 719 (1984) ("[I]f sufficient untainted evidence was presented in the warrant affidavit to establish probable cause, the warrant was nevertheless valid."). Specifically, the parties should address whether the affidavit still shows probable cause if those statements that meet the *Franks* and *Macias* standard are excised from the warrant.  This should include, but is not limited to, how the probable cause analysis is affected specifically by the three crimes listed on the warrant and the items to be seized in relation to the remaining facts.  Within the context of determining whether there is probable cause on the remaining portions of the affidavit, the parties should also address whether or not the particularity requirement, *Davis v. Gracey*, 111 F.3d 1472 (10th 1997) ("The particularity requirement ensures that a search is confined in scope to particularly described evidence relating to a *specific crime* for which there is demonstrated probable

cause."), and severability doctrine, *United States v. Sells*, 463 F.3d 1148 (10th Cir. 2006), are applicable in this probable cause analysis.  The parties, of course, are not limited to the cases listed on any issue.

### c.  Good faith exception

The parties should discuss how a determination under a *Franks* analysis and the statement in *United States v. Kennedy*, 131 F.3d 1371, 1376 (10th Cir. 1997) affects the application of the good faith exception.

### d.  Marital communications privilege

Mr. Troxel raised this issue in paragraphs 3 and 4 of his Motion.  Neither of the parties have addressed the issue, so the Court also orders supplemental briefing on the issue.  The parties should address the applicable burden, whether the letters were communications, and whether the letters are confidential, among any other applicable issues.

**IT IS HEREBY ORDERED** that the Motion to Suppress (doc. # 14) is DENIED in part, as set forth in Part II.  The Court RESERVES its rulings on the remaining suppression issues until the parties have filed their supplemental briefings as ordered in Part IV.  The Government and Mr. Troxel have two weeks from the date of this Memorandum and Order to file their supplemental briefs, and four weeks from the date of this Memorandum and Order to file their responses to the opposing party's supplemental brief.

**IT IS SO ORDERED.**

Dated this 17th day of April, 2008.

s/ John W. Lungstrum
John W. Lungstrum
United States District Judge